JOHN PURVIS V. THE STATE.

No. 16038.   Delivered October 25, 1933.
Reported in 63 S. W. (2d) 1030.

The opinion states the case.

*J. A. Johnson, J. B. Keith,* and *E. T. Chandler,* all of Stephenville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, JUDGE.—The appellant was convicted of the offense of embezzlement and his punishment assessed at confinement in the state penitentiary for a term of two years, from which judgment he appeals.

The indictment charged "that John Purvis, on or about the first day of January, A. D., 1929, anterior to the presentment of this indictment in the County of Erath and State of Texas, was then and there an employee of Fred Winn, tax collector of Erath county, Texas, and the said John Purvis did then and there fraudulently take, misapply, and convert to his own use $1394.81 in money, the same being then and there the current money of the United States belonging to said county, and which said money had theretofore come into and then and there was in the custody and possession of the said John Purvis by virtue of his employment by Fred Winn, tax collector, Erath county, Texas."

By bill of exception No. 1 the appellant complains of the action of the trial court in refusing to give his requested peremptory charge directing the jury to return a verdict of not guilty on the theory that the evidence was insufficient to warrant a conviction. The state relied for a conviction in this case on the testimony of the auditor, who testified as follows:

"I was employed by the Commissioners Court of Erath County to audit the books of the tax collector. I checked the tax collector's reports to determine how much money he collected during the month of January, 1929. The tax collector made a report for said month giving the name of the taxpayer, a brief description of the property, the amount collected for the state, the amount collected for the county, and the amount collected for the subdivisions, such as roads and schools. I checked these pages and brought them into a recapitulation and brought the recapitulation over to the summary. When the tax collector pays the money to the county treasury they have a duplicate receipt book; she writes a receipt to the collector and he gets the original and she keeps the carbon copy. The receipts when added together will show the total amount paid to her. I compared them with the summary on each monthly report and it disclosed $1058.51 short in the county ad valorem funds, $134.04 in the road district funds, $206.96 in the school funds, a total of $1395.51 in ad valorem, road, and school funds."

He further testified:

"I checked the December, 1930, report in the same way and the check disclosed a shortage of $200.00 between the amount taken and the amount turned over to the county treasurer. I checked the October, 1929, report in the same way and it disclosed a difference of $28.39 between the amount collected and the amount turned over to the county treasurer. I knew that

the county had a depository but I did not attempt to audit the books of the county depository. If I had wanted to find out where that money went to, if it had been actually collected and not deposited, I could have checked the books of the county depository. I did not go over there to see whether it ever got into the bank. It is a fact that there is no way of finding out whether or not any money was stolen from the tax collector's office here except to go over there and get the deposits and come back here and check it with the amount they took in. Then I could have told whether or not any money was stolen down here. I did not try to determine whether any was stolen or not. I was trying to find out how much money had been reported to the county in those years. I did not try to determine whether John Purvis or anybody else took any money out of that office down there after it was collected. I did not try to do that. I tried to determine how much money the county got through its treasury; that is the extent of my investigation. The investigation I made here did not determine whether or not all the money that was collected down there in this office was in the depository. I never tried to do that."

The state introduced the tax collector, Mr. Winn, who testified that the money which was collected was deposited daily in the county depository either by him or one of his deputies during the busy season and then a draft drawn in favor of the county treasurer on the tax collector and in that way the funds were transferred to the county treasury. The money that belonged to the schools was transferred in the same way and a report thereof furnished the county school superintendent. He further testified:

"I have some of the checks that were paid by the county tax collector to the county treasurer and these are in the handwriting of John Purvis; he signed all of the checks that were drawn by the tax collector on the depository in favor of the county treasurer. Mr. Purvis made the deposits and he usually made out the summary; he made up the body of the report from the stubs or copies of the receipts. During the month of January, 1929, John Purvis, Jack Henderson, and King Hamilton worked in the tax collector's office. We had one money drawer in the center of the room and people would go in and out and go behind the counter and stand around there and talk, and while the rush was on we were all busy. Everybody was collecting money and putting it in the till. Some people would pay their taxes by checks, some by money orders, and some in cash, and at the end of the day the checks, money orders, and

cash were taken over to the depository and deposited. We had deposit slips and we would make out the deposit slips in duplicate and take them over to the depository with the checks, money orders and cash, where it was checked over and okehed by the depository. The original of the deposit slips was retained by the depository and a copy brought back to the tax collector's office. * * * When the crash came and after the audit was made a discrepancy was found; it was disclosed that I had some money left in the county depository in my name as tax collector of Erath County. I had $1953.00 in round numbers. I don't know whether that was tax money that was actually collected by the tax collector's office and placed in the county depository. I don't know whether it was or not. I never did undertake to find out. Mr. Purvis drew it out; I did not write the checks,—yes, I drew it out; I took it out and put it in another bank soon after I went out of office. Since this row has arisen about the shortage I have never gone to the bank to have them show me how this money was distributed and the county never did."

The evidence further shows that there was some shortage in the years 1927 and 1928 at which time the appellant was also working in the tax collector's office. No direct testimony was offered upon the trial tending to connect the appellant with the appropriation, if any, of the money, but the state relied solely upon the circumstances showing these shortages, showing that the monthly reports were made out by the appellant, and that the appellant made the daily deposit in the county depository. From the testimony adduced upon the trial, as disclosed by the statement of facts, we have reached the conclusion that it does not exclude every other reasonable hypotheses than that of the appellant's guilt. With the tax collector testifying that the money was deposited in the depository as it came into his office and that the books of the depository were not checked to determine whether any of the money collected was not regularly deposited in the depository raises the outstanding hypothesis that the funds, if any, were not taken by the appellant while they were in his possession by virtue of his employment. Just what the receipts of the county depository were was not determined and was not examined or explored by the auditor or anyone else and after the close of four years of business there remained in the county depository some $1953.00 which was subsequently withdrawn by Mr. Winn, the tax collector. The failure of the state to explore this avenue of evidence raises the presumption that it was unfavorable to the state especially in

view of the fact that the only way they showed an embezzlement at all was to show a variance between the amounts collected by the tax collector and the amount that found its way into the county treasury. The evidence conclusively shows that the tax collector deposited the collections made by him in the county depository and not in the county treasury. It appears from the record that after the tax collector deposited the daily collections in the depository and after he made his monthly report to the county, drafts were then drawn on the county depository by the county treasurer against the tax collector's account and which were then placed by the county treasurer on his books to the various funds, that is, the county ad valorem, the road and bridge, the jury, and the school funds and a report thereof made to the county superintendent. Just why the deposit books were not audited seems to be shrouded in mystery when it could have been so easily determined whether the money collected by the collector was all deposited in the county depository. Of course, there are suspicious circumstances such as the discrepancy in the recapitulations and summary of the report of the tax collector which were made by the appellant, but whether these discrepancies were due to an intent on the part of the appellant to fraudulently misapply any of the funds or was due to an error is not disclosed by the evidence. However, the discrepancies would not be sufficient to warrant a conviction of embezzlement. The disposition which we have made of bill of exception No. 1 necessarily disposes of bills of exception Nos. 2, 3, 4, and 5 as they relate to the same matter.

By bill of exception No. 6 appellant complains of the action of the trial court in declining to sustain his objection to paragraph 5 of the court's main charge, which reads as follows:

"If, therefore, you believe from the evidence in this case beyond a reasonable doubt, that John Purvis in Erath County, Texas, and on or about the first day of January, 1929, was then and there in the employ of Fred Winn, tax collector of Erath County, Texas, that the said John Purvis did then and there fraudulently take, misapply, and convert to his own use $1394.81 in money, the same being current money of the United States belonging to said county, and which said money, if any, had theretofore come into and then and there was in the custody and possession of the said John Purvis by virtue of his employment, if he was employed by Fred Winn, tax collector of Erath County, Texas, then he would be guilty as charged."

The appellant objected to this charge because it did not require the jury to find and believe beyond a reasonable doubt

that defendant did take, misapply, and convert to his own use $1394.81 and that it did not require the jury to find beyond a reasonable doubt that such money had theretofore come into the possession of the defendant by virtue of his employment. We believe that the criticism leveled against this charge is not entirely without merit. The court should have, upon said objection being made, reformed his charge so as to meet the objection.

The appellant by bill of exception No. 7 complains of paragraph 4 of the court's charge because in the indictment the defendant is charged with taking and misapplying the sum of $1394.81 but the charge is not limited to said amount. We do not deem this objection tenable. It made no difference under the law whether the proof showed he only took and misapplied $500.00 instead of $1394.81. The vice is not in the amount taken but in the act of taking and misapplying.

The matters complained of in appellant's bills of exception Nos. 8, 9, 10, and 12 appear to us to be without merit.

By bill of exception No. 11 the appellant complains of the action of the trial court in refusing to define the term "money," but in view of the fact that there was not any affirmative issue as to what kind of money or medium of exchange, if any, was taken and misapplied, we do not deem the error of such import to cause a reversal of this case. However, the court should in a proper case when the facts require it in his charge give the definition of the term "money" as defined in article 1544 of the Penal Code.

The appellant in his bill of exception No. 13 complains of the action of the trial court in refusing to give his requested special instruction, which reads as follows:

"You are further charged that if there is any testimony before you in this case tending to show that the defendant herein committed offenses other than the offense alleged against him in the indictment, you can not consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and if you find and believe beyond a reasonable doubt from such testimony that other offenses were committed you may then consider the same in determining the intent, and for no other purpose."

We believe that the court erred in refusing to give said charge or one of like import.

The matters complained of in bill of exception No. 14 will not arise again upon another trial in view of what we have said

in reference to appellant's objection to paragraph 5 of the court's main charge. The testimony objected to and as set forth in bills of exception Nos. 16 and 17 was admissible to show system and intent. The matters complained of in bills of exception Nos. 18 to 28, both inclusive, appear to be without merit.

The argument of the district attorney complained of in bill of exception No. 29 is not deemed to be of such a nature as to have prejudiced the appellant with the jury; besides the court upon objection being made to said argument promptly instructed the jury not to consider the same.

Believing that the testimony adduced upon the trial is insufficient to warrant a conviction, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.